which in effect denies registration, is affirmed.

Affirmed.

26 C.C.P.A. (Patents)

### In re MOSS et al.
### Patent Appeal No. 4076.

Court of Customs and Patent Appeals.

Feb. 6, 1939.

Eugene L. Greenewald, of New York City (Warren J. Willis, Wilbur J. Kupfrian, and Alfred E. Page, all of New York City, of counsel), for appellants.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

Appellants, on November 29, 1933, filed their application with the United States Patent Office for a patent relating to a method and an apparatus for an annealing treatment of steel for the elimination of certain objectionable metallurgical changes brought about by the high temperatures employed by oxy-acetylene cutting flames.

The application contained both apparatus and method claims. The Primary Examiner required division between the apparatus and the method claims. The method claims only were considered by the examiner and of them claims numbered 4, 5 and 11 were allowed, while claims 1 and 30 to 36, inclusive, were rejected.

Upon appeal to the Board of Appeals, the decision of the examiner rejecting the said method claims and his decision requiring division were affirmed. From the decision of the board, appellants have appealed here and by appropriate reasons of appeal raise two principal questions, the first relating to the correctness of the decision of the board in affirming the rejection of said method claims, upon the prior art cited, and the second to the correctness of the said decision affirming the examiner's requirement for division.

Appellants' invention is aptly described by the Board of Appeals in the following language: "The subject matter of the appealed claims is a process of annealing the

edges of material cut by an oxy-acetylene flame. It has long been recognized that when the oxy-acetylene flame is used for either welding or cutting the parts of the metal immediately adjacent the weld or cut are necessarily hardened if the steel contains over .3 carbon. It is alleged that in attempting to bend steel cut in this manner without re-annealing, hair cracks will form in the hardened surface of the material. It is recognized that the steel cut in this manner can be annealed by placing the material in an annealing furnace and heating it up above the critical temperature, but in structural steel of large dimensions, this type of annealing is not feasible and appellant proposes to anneal the cut edges by local application of an oxy-acetylene flame. This is done by directing the flame directly against the cut surface so as to heat up the metal affected to the critical temperature followed by gradual cooling. Appellants also provide another series of flames of less intensity so as to delay the cooling of the metal after it has once been heated to the high temperature. After the metal has cooled down below the critical point it may be quenched in any suitable manner."

It is thought that claims 1 and 36 of the appealed claims are illustrative of the subject matter on appeal, and they read as follows:

"1. In a method of substantially eliminating objectionable change produced in the metallurgical structure of metal cut by oxidizing and high-temperature heating agents, the step which comprises locally reheating successive portions of the exposed and thermally affected surface formed by the cutting operation."

"36. The method of reconditioning the metallurgical structure of metal cut by means of oxidizing and high-temperature heating agents, which comprises first progressively reheating the exposed and thermally-affected surfaces to above the critical temperature, and subsequently progressively applying to said surfaces local high-temperature heat of less intensity than the first reheat."

The references listed in the decision of the examiner are: Koller: High Temperature Control: Photo-electric-tube Pyrometry. Industrial and Eng. Chemistry, 1931, Vol. 23, pages 1379-1381; Moss: Machining with Oxyacetylene I— American Machinist, 1932, Vol. 76, pages 1217-1219. (See especially page 1219); P.L.R.: The Local Annealing of Metallic Arc Welds. The Welding Journal. Aug. 1925, pages 234-235; Anonymous: Heat Treatment with the Oxy-Acetylene Flame. Oxy-Acetylene Tips. Feb. 1926, pages 128-132; Miller, 1,828,977, Oct. 27, 1931.

Claims 1 and 30 to 36, inclusive, were rejected by the examiner on the patent to Miller and the article by Moss as supplemented by the reference articles listed under the letters "P.L.R." and the term "Anonymous." Claims 30, 31 and 32 were rejected substantially upon the same ground as was claim 1, although in somewhat different language. Claim 36 was rejected on the same ground as claim 1, but since that claim (36) called for "subsequently progressively applying to said surfaces local high-temperature heat of less intensity than the first reheat," the examiner pointed out that the said P.L.R. and Anonymous references teach the idea of withdrawing the flame gradually to control the rate of cooling and "the last part of this claim merely requires that the torch be held farther away from the work which produces less heating."

The patent to Miller is the principal reference applied by the examiner and it is the only reference specifically relied upon by the Board of Appeals.

The board noted that the article by Moss (one of the appellants) on "Machining with Oxyacetylene," which stressed the need for annealing flame-cut edges of steel castings, was published in 1932, not more than two years prior to the filing of appellants' patent application, and in view of this fact stated: "For these reasons the 'Moss' article must be abandoned as a reference against the appealed claims."

The patent to Miller relates to a method of annealing fusion welds at the time the welds are made. Miller points out that the intense heat engendered in the welding material (if any is used) and the edges of the portions which are welded together by the use of an oxy-acetylene blowpipe or an electric arc, leaves the structure of the metal at the point of welding in a coarsened condition so that its ductility is somewhat lowered. He points out that the method of curing this difficulty, prior to his invention, consisted of permitting the welded article to become cool or nearly so and to then reheat it in its entirety or at least the entire weld and the metal in the vicinity of the weld and that this process was wasteful of both heat and time. In his patent he teaches that an oxy-acetylene

blowpipe may be applied directly to the weld and the adjacent portions so as to intensely heat this particular portion of the article. His annealing means is moved along the weld a certain distance behind the welding means. The annealing takes place before the welded portion of the article loses the heat which was applied in the welding operation. In this manner he saves heat and time. He points out that while the welding means and annealing means may be used simultaneously, they are separate operations and that one must not interfere with the other.

The board, in affirming the decision of the examiner, said: "It must be admitted that no one of the references cited shows the use of an oxy-acetylene flame for the purpose of annealing a flame cut edge, but the patent to Miller shows that it is old to anneal a weld by means of such a flame. In view of the fact that it is quite old to anneal steel which is too hard by heating it up above the critical temperature and then permitting it to cool slowly, we can see no invention in the board [broad] proposition of annealing a cut edge by directing the flame perpendicular to said edge. The annealing of a welded joint is closely analogous to the annealing of a welded edge. Appellants admit that the assignee of this application has a co-pending application for annealing a cut edge by applying the annealing heat simultaneously with the cutting of the steel. Where the steel being cut is comparatively thin, this method of annealing is feasible. In steel of considerable thickness it is probable that such a method is not feasible, but we believe that it would be apparent to any one skilled in this art that in annealing cut steel of considerable thickness that the flame should be directed to the cut surface."

Appellants, on this phase of the case, here contend that it was error for the board to affirm the examiner's rejection of their claims for a method of annealing the edges of acetylene cut steel upon the Miller disclosure which related to annealing a welded portion of two pieces of metal. Appellants urge that welding and cutting with an acetylene torch "are diametrically opposed from the standpoint of purpose." It is pointed out that a new metal is inserted between the welded portions which may possess entirely different characteristics than that possessed by the welded portions and that the problems which confronted the applicants and Miller were wholly unrelated.

We are in agreement with the board in its conclusion to the effect that it being known that the defects in the metallurgical structure of metal caused by the intense heat of an oxy-acetylene welding operation could be cured by annealing with the application of heat from an acetylene torch, it would not require invention to apply the torches in the manner taught by the applicants to the edges of pieces of metal to accomplish substantially the same purpose. It is true that the problems confronting the applicants and Miller were not identical, but it seems that the principle involved in solving the problems is identical.

It will be observed that appellants' application by both drawings and specification teaches that by appropriate mechanical means torches emitting intense heat are first applied perpendicularly to the edges to be treated. This is followed by similarily applying torches with heat of lesser degree of intensity, the latter being controlled by automatic means (embodied in claim 32), stated to be a photoelectric cell, which regulates the intensity of the heat applied. The Koller article shows that it is old to use a photoelectric tube to regulate temperatures. In other words, the method which applicants teach, except as to the limitation relating to automatically regulating the rate of cooling, consists of the elements defined in the allowed claims 4, 5 and 11. They comprise the steps of first applying a source of intense heat locally to the surface to be reconditioned; second, retarding the cooling of the said surface by progressively (controlled by the electric eye) applying a second source of less intense heat locally to the successive heated portions of the surface. The claims upon appeal are much broader than the invention which is described in appellants' specification and as is defined by the allowed claims. The invention defined by the appealed claims therefore calls for nothing which we regard as inventive over that which was taught by Miller. The board was not in error in affirming the decision of the examiner for the reasons which it stated.

This brings us to the second question presented in the case: Did the board err in affirming the decision of the examiner requiring division between the method and the apparatus claims. Claim 12 is typical

of the apparatus claims and reads: "12. Apparatus for restoring the metallurgical structure of a metal cut by oxidizing and high temperature heating agents which comprises a source of high temperature heat for reheating the cut edge to a predetermined degree of temperature above the critical range; a second source of heat of relatively less intensity arranged at a short distance behind the first source of heat, and means for supporting both said sources of heat and moving the same relative to the cut edge."

In appellants' brief there is considerable space devoted to this phase of the case. Certain Patent Office decisions, together with the case of General Electric Co. v. P. R. Mallory & Co., Inc., 2 Cir., 298 F. 579, have been cited. The Solicitor for the Patent Office on this phase of the case cites the following decisions in support of his contention that the requirement of division was a proper one: In re Burns, 83 F.2d 292, 23 C.C.P.A., Patents, 1091; In re Frasch, 27 App.D.C. 25; In re Butler, 37 F.2d 623, 17 C.C.P.A., Patents, 810; and In re Pedersen, 73 F.2d 928, 22 C.C.P.A., Patents, 788.

Appellants argue that the apparatus claims and the method claims in their application are for substantially identical subject matter and that they require "searches of the same scope." They point out that the Patent Office "has long adopted the rule that method claims, and claims directed to apparatus for carrying out the method may properly be examined in a single application especially when the respective classes of search are in the same division," and state: "Some doubt exists in the present case as to whether the invention resides in the method, in the apparatus or in both. Under these circumstances it is not at all unusual to allow claims both to the process and to the apparatus."

They further state that if division is required and a patent is issued for the apparatus there is a likelihood of the respective patents being acquired by separate owners and that neither would have a free and unrestricted use of his invention. Along this line of argument, it might be further suggested that, as far as we know, and as was suggested by counsel for Allen before the Supreme Court in United States ex rel. Steinmetz v. Allen, 192 U.S. 543, 554, 24 S.Ct. 416, 48 L.Ed. 555, "the courts have never declared a patent invalid because of the joinder of

distinct inventions," (see In re Ferenci, 83 F.2d 279, 23 C.C.P.A., Patents, 1023), and that division is not required upon the theory that the inclusion of two distinct inventions in the same application would render any portion of the patent invalid.

As we have frequently said, and as has been said by the Supreme Court of the United States and other courts, the question of division is a troublesome one in that it is difficult to lay down any general rule by which to determine when a given invention shall be embraced in one or more patents. In Bennett v. Fowler, 8 Wall. 445, 19 L.Ed. 431, it was pointed out that some discretion must be left to the Patent Office. The rule (41) in the Patent Office at the time that decision was rendered was so definite in its requirement for division that the Supreme Court in United States ex rel. Steinmetz v. Allen, supra, pointed out that the "rule is not the exercise of discretion; it is a determination not to hear." The rule was later amended so that when the inventions were mutually dependent they could be claimed in the same application. In the Steinmetz Case, supra, the court recognized that the Patent Office tribunals should have discretion in this matter and indicated, we think, although no definite rule was laid down, the circumstances under which a requirement of division would be regarded as an abuse of such discretion.

We have had before us for review in a number of cases the question of division. It is unnecessary to discuss all of our decisions because in Re Pedersen, supra, most of those decisions, which are pertinent here, were reviewed and discussed with reference to their application to facts which are almost identical with those at bar. It must be remembered at the outset that Patent Office rule 41, as it now exists, provides, and properly so, that "where several distinct inventions are dependent upon each other and mutually contribute to produce a single result, they may be claimed in one application."

In the Pedersen Case, supra, claims for a cigar enveloping machine and for a process of enveloping a cigar, and for the product—a cigar which might be enveloped by the machine—were involved. The Patent Office had required division between the claims relating to the machine and the claims relating to the process and the product. We are not here concerned with that portion of the decision relating to the

product. We here have, as we had there, the relation between the machine and the process. We there said, 73 F.2d 930:

"It seems clear that the determination of the patentability of the apparatus claims in appellant's application does not necessarily determine the patentability of his process and product claims. His apparatus claims may embody an invention, while his process and product claims may not. If the process claims are not dependent upon the apparatus described and claimed in the application, but may be performed by hand or upon other machines, it would seem that two distinct inventions would be involved if the process claims are patentable. This observation may also be made as to the product claims.

\* \* \* \* \* \* \* \* \*·

"As we construe the above-quoted language of the Supreme Court [referring to United States ex rel. Steinmetz v. Allen, supra], we would not be warranted in reversing the decision of the Patent Office tribunals in requiring division of appellant's application unless there was an abuse of discretion upon their part in determining that the inventions here involved are not so closely related that division would be improper.

"Upon the record before us, we cannot find that there was any such abuse of discretion. If the process and product claims, or any of them, are patentable per se, and a separate patent should issue therefor, we have no doubt that such patent would be sustained by the courts, irrespective of the issue of a separate patent upon appellant's apparatus claims."

Our holding in Re Pedersen, supra, in substance was that where the Patent Office had required division between a machine claim and a process claim on the theory that the inventions were not so closely related that division would be improper, we would not reverse the tribunals for abuse of their discretion if it appeared that the process claims were not dependent upon the apparatus, for the reason that the process might be performed by hand or upon other machines; that in that instance there would be two inventions and that the Patent Office tribunals in their discretionary power under the said rule would have the right to require division, it being understood that the main purpose of the rule was to facilitate the search in considering the patentability of the claims.

If it is proper in every instance to require division between apparatus and process claims where the process can be performed by other machines or by hand, it may be pointed out that if the Patent Office tribunals exercise their discretion in this manner in all of their rulings and require division, no patent will ever contain apparatus and process claims, since if the process can be performed on the apparatus alone, it is probable that the process claims would be rejected upon the ground that they merely call for the function performed by the machine. In the light of this consideration, it may be argued that such an interpretation of the rule and a requirement of division in applying the rule so interpreted results in rendering futile the provision in the rule which authorizes the inclusion in a single application of claims for several distinct inventions. This is not necessarily true, because there is an abundance of opportunity for the application of the rule as applied to related inventions other than might be claimed for apparatuses and processes. For instance, it frequently occurs that claims for combinations and subcombinations are so interdependent and closely related that it would obviously be proper to include them in the same application. The requirement for division of this character of claims was thoroughly considered and many decisions pertaining to the question were discussed in Re Ferenci, supra. Moreover, if a process claim calls for nothing more than the function of the apparatus and must be rejected for that reason, it would be proper to submit it in the application containing the apparatus claim. In such instances, the chief reason for the rule requiring division would be absent insofar as the same search or substantially the same search in the same division of the Patent Office would be required in considering both kinds of claims.

We do not mean to hold that the dependency of claims and their relation to each other with respect to being included in the same application may be controlled entirely by an arbitrary classification of references in the Patent Office. See In re Ferenci, supra. The Commissioner of Patents, subject to the approval of the Secretary of Commerce, however, is authorized to establish rules which promote the efficient and expeditious consideration of patent applications and the interpretation by the Patent Office tribunals of its valid rules

should be upheld, where such interpretation brings the application of such rules within the limits which the courts have sanctioned.

Since it is obvious that the invention claimed in the appealed process claims might be performed by another machine or by hand, it is not the same invention as that defined by the apparatus claims, nor are the process claims sufficiently dependent upon the apparatus claims as to bring them within this portion of the rule (41). Certainly this is true, in view of the fact that, in requiring division, the board has expressly found that the two groups of claims cover subject matter which is separately classified in the Patent Office and require separate search in different divisions therein.

For the reasons hereinbefore stated, it is our view that we would be wholly unjustified in reversing the decision of the Board of Appeals in affirming that of the examiner requiring division of the claims as aforesaid.

It follows that the decision of the board on both points raised by the reasons of appeal should be, and it is, affirmed.

Affirmed.